The VIRGIN ISLANDS WATER AND POWER AUTHORITY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 92–595L.

United States Court of Federal Claims.

Jan. 12, 1994.

Kevin A. Gaynor, Washington, DC, attorney of record for plaintiff; John F. Cooney, James F. Worrall, Matthew L. Iwicki, and Venable, Baetjer, Howard & Civiletti, of counsel.

Thornton Withers Field, Washington, DC, with whom was Asst. Atty. Gen. Louis Schiffer, for defendant; John A. Sheehan, Michael J. Zevenbergen, James K. Augustine, and Mary Ellen O'Neill, of counsel.

### OPINION AND ORDER

FUTEY, Judge.

This matter is before the court on plaintiff's motion for judgment on the pleadings of defendant's counterclaim and plaintiff's motion for partial summary judgment. Plaintiff attacks the counterclaim on the grounds that it is not within the subject matter jurisdiction of this court.[1] Plaintiff also moves for partial summary judgment on the issue of negligence, asserting that defendant is collaterally estopped from relitigating an issue which was decided in an earlier Coast Guard proceeding. Defendant denies that the issue has ever been litigated and seeks costs for defending this allegation.

### Factual Background

In September 1989, Hurricane Hugo struck the United States Virgin Islands, causing severe damage. Pursuant to the procedure set forth in the Stafford Act, 42 U.S.C. § 5141 (1988), the President declared

---

1. Plaintiff also averred that the minimal facts of defendant's counterclaim failed to set forth a claim for which relief may be granted. On July 14, 1993, defendant moved to strike plaintiff's reply to defendant's opposition to plaintiff's motion to dismiss defendant's counterclaim. Pursuant to a telephone conference held on September 22, 1993, the court issued an order instructing defendant to amend its counterclaim. This amendment provided sufficient detail to state a claim and mooted defendant's motion to strike.

a "major disaster."[2] By Executive Order 12148 the President delegated his authority under the Stafford Act to The Federal Emergency Management Agency (FEMA). Plaintiff, Virgin Islands Water and Power Authority (VIWAPA), on approximately September 18, 1993, discovered a leak in the piping of their Fuel Tank No. 5 (tank) located in Christiansted, St. Croix, the United States Virgin Islands. Plaintiff contends that the leak occurred when Hurricane Hugo, swept through the Virgin Islands, causing the retaining wall encircling the tank to collapse. The collapse of the wall, in turn, caused a 6-inch storm drain pipe to strike and break the tank's inline thermometer, thereby allowing fuel to escape through the broken thermometer. From the tank, 14,000 barrels of No. 6 fuel oil spread to Christiansted Harbor. Thereupon, VIWAPA, the United States Coast Guard, and the Virgin Islands Department of Planning and Natural Resources acted in concert to remove the oil. Plaintiff filed a complaint in this court on September 1, 1992, seeking $6,716,135.00 in removal expenditures, plus costs, under the Clean Water Act 33 U.S.C. § 1321(b)(3) (1988). Plaintiff later amended this claim and is now seeking $7,260,000.00. Defendant counterclaimed for all money that has been advanced to VIWAPA from FEMA.

## I. *Counterclaim*

In its amended counterclaim, defendant averred that after the hurricane, plaintiff filed a claim with FEMA for reimbursement of its costs of cleaning up the oil spill. According to defendant, VIWAPA, has applied for $7.4 million in disaster relief for oil spill cleanup from FEMA. Of this amount,

FEMA allegedly has advanced VIWAPA $4.2 million.[3] An audit report produced by the United States Department of the Interior, Office of the Inspector General, questioned the $7.4 million claim because, in its view, plaintiff has not pursued full insurance recovery from its carrier. Section 42 U.S.C. § 5155(a) and (b) of the Stafford Act prohibits duplicative assistance where an applicant is eligible to receive assistance from another source.

Essentially, plaintiff argues that it is currently attempting, in an administrative proceeding, to resolve the issue of liability to FEMA for the amount of the counterclaim. Therefore, plaintiff contends that the counterclaim is still within the agency's jurisdiction. FEMA regulation 44 C.F.R. § 13.52(a) states that—

> Any funds paid to a grantee in excess of the amount to which the grantee is finally determined to be entitled under the terms of the award constitute a debt to the Federal Government. If not paid within a reasonable period after demand, the Federal agency may reduce the debt by ... other action permitted by law.

Thus, plaintiff argues that there is no debt owed to the government until FEMA finally determines the amount; an event which has yet to occur. Further, 44 C.F.R. §§ 206.206 and 13.43(b) provide for administrative appeal from such a final determination.[4]

## II. *The Clean Water Act*

Jurisdiction over the entire claim, however, is asserted in this court under the Clean Water Act, 33 U.S.C. § 1321 *et seq.* (1987). The Clean Water Act mandates that it "is the

---

2. Under § 5141, "[a]ll requests for a declaration by the President that a major disaster exists shall be made by the Governor of the affected States. ... Based upon such Governor's request, the President may declare that a major disaster exists, or that an emergency exists." *See generally,* the Stafford Act, 42 U.S.C. § 5121 *et seq.* (1988).

3. Regulation sections 44 C.F.R. § 205.39(b), (d) and (e) provide for the transfer of funds in a major disaster, provided that the state agrees to seek the "recovery of funds which are expended in alleviating the damages and suffering caused by any declared major disaster ... [from] any party or parties whose acts or omissions may in any way have caused or contributed to the dam-

age or hardship for which Federal assistance is provided...." Pursuant to 44 C.F.R. § 206.66, "[t]otal assistance provided in any given emergency declaration may not exceed $5,000,000.00, except when it is determined ... that: (a) Continued emergency assistance is immediately required; (b) There is a continuing and immediate risk to lives, property, public health and safety; and (c) Necessary assistance will not otherwise be provided on a timely basis."

4. Presumably, appeal would then be to the district court under the Administrative Procedure Act, 5 U.S.C. § 702 (1988); *see also Ashgar v. United States,* 23 Cl.Ct. 226, 230 (1991).

policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States." *Total Petroleum, Inc. v. United States*, 12 Cl.Ct. 178, 180 (1987) (*quoting* 33 U.S.C. 1321 (1982)). Moreover, under the Act, the cost of cleanup, should a discharge occur, lies with the owners of the facility or vessel discharging the oil. *Cities Serv. Pipe Line Co. v. United States*, 4 Cl.Ct. 207, 209 (1983), *aff'd*, 742 F.2d 626 (Fed.Cir. 1984). [Citations omitted]. Thus, it is the clear congressional intent that "cases where the public pays for cleanup [are] the exception, not the rule." *Id.*

■ Plaintiff contends, however, that under 33 U.S.C. § 1321(i) it should be reimbursed for the cost of the cleanup. 33 U.S.C. § 1321(i) provides:

In any case where an owner or operator of a vessel or an onshore facility . . . from which oil or a hazardous substance is discharged . . . acts to remove such oil . . . such owner or operator shall be entitled to recover the reasonable costs incurred in such removal upon establishing, in a suit which may be brought against the United States Government in the United States Claims Court, that such discharge was caused solely by (A) an act of God, (B) an act of war, (C) negligence on the part of the United States Government, or (D) an act or omission of a third party without regard to whether such act or omission was or was not negligent, or of any combination of the foregoing causes.

The Clean Water Act imposes strict liability upon the owner or operator unless he "can prove that one of the exceptions does apply." *Sabine Towing & Transp. Co. v. United States*, 229 Ct.Cl. 265, 268, 666 F.2d 561 (1981). In enacting the statute—

Congress determined that a system of absolute liability with specified limits best protected the public interest. Such a system, it was felt, properly placed the cost

for an oil spill on the responsible party, and not on the general public.

*Reliance Ins. Co. v. United States*, 230 Ct.Cl. 390, 397–98, 677 F.2d 844 (1982). Accordingly, "plaintiff must carry an extraordinarily heavy burden to recover cleanup costs from the United States." *St. Paul Fire & Marine Ins. Co. v. United States*, 4 Cl.Ct. 762, 768 (1984). A plaintiff must show:

First . . . that the spill was entirely the result of one or more of the causes listed in section 1321(i)(1). . . . Second, even where causation is so limited, plaintiff must establish that it could not have prevented the spill through the exercise of due care. [Citation omitted.]

*Cities*, 4 Cl.Ct. at 209.

### III. *Discussion*

■ In this case, there are two different statutes, the Stafford Act and the Clean Water Act under which plaintiff may pursue recovery in two different forums. Plaintiff has chosen to pursue both avenues, and is seeking essentially the same amount under the Stafford Act from FEMA, as it is before this court under the Clean Water Act. Inasmuch, as the counterclaim still appears to be the subject of an administrative proceeding before FEMA, so too does the entire claim. Defendant, moreover, asserts: "[p]laintiff's exhaustion argument [that the counterclaim is not ripe for adjudication], *arguendo*, would apply *equally* to plaintiff's action as it, too, has not exhausted its administrative remedies for seeking compensation for the cleanup." [5]

In its July 12, 1993, joint preliminary status report, plaintiff revealed that the proceedings with FEMA have reached a juncture where FEMA is insisting that VIWAPA must pursue its insurance carrier before pursuing further reimbursement from them. VIWAPA's insurance carrier, meanwhile, in-

---

**5.** Defendant's Motion to Strike, p. 2, n. 2. *See also*, Defendant's Opposition to Plaintiff's Motion To Dismiss Defendant's Counterclaim, June 14, 1993 ("In fact, plaintiff is currently attempting, in an administrative forum, to resolve those debts with defendant's agencies, and may be seeking even more federal funds *in lieu of compensation in this action.*") [Emphasis added.] Defendant, in addition, "believes the administrative process should be exhausted before the matter is pursued here." *Id.* Nonetheless, defendant has not formally moved on that ground and the court is addressing this issue *sua sponte.*

sists that VIWAPA must pursue its case in this court, before it determines coverage.[6]

Nonetheless, even if this court were to address the issue of liability now, the court would still eventually have to wait for FEMA to determine the amount of the claim that it is willing to reimburse. There exists, then, the probability of duplication of effort between FEMA and this court. Although the issue of exhaustion has been raised, these circumstances are more closely analogous to a situation wherein the doctrine of primary jurisdiction is applicable. The Supreme Court in *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64–65, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956), enunciated the difference between the exhaustion doctrine and the doctrine of primary jurisdiction:

> "Exhaustion" applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course. "Primary jurisdiction," on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is *suspended* pending referral of such issues to the administrative body for its views. [Citation omitted.] No fixed formula exists for applying the doctrine of primary jurisdiction. [Emphasis added.]

*See also, Ainsley v. United States*, 8 Cl.Ct. 394, 403 (1985). Although this claim is cognizable, albeit under different statutes, before both the Court of Federal Claims and FEMA, it is in the interest of judicial economy for the FEMA proceeding to reach its conclusion. Hurricane Hugo was a major disaster and FEMA is coordinating monetary and other relief efforts. On these facts, FEMA should finalize its initial determination on reimbursement to VIWAPA for its disaster efforts, before this court commences its deliberations.

### *Conclusion*

Accordingly, this case is not ripe for determination in this court and proceedings are stayed pending a final determination by FEMA. *See Aulston v. United States*, 823 F.2d 510, 513–14 (Fed.Cir.1987). In light of this court's suspension, it is unnecessary to reach the counterclaim and estoppel issues. The parties are directed to file joint status reports as to the status of the FEMA proceedings at intervals of 60 days. First report is to be filed by March 14, 1994. No costs at this juncture.

---

6. Further in a letter written by VIWAPA in response to the audit, VIWAPA states:

    Pursuant to the Authority's duty to seek indemnification from all available sources before the excess/pollution policy's coverage is applicable, the authority shall soon initiate a claim in the U.S. Court of Claims for $5.5 million in oil spill clean up costs. The filing of the court of claims [sic] action is being taken because the insurer, Aegis, indicates pursuant to an indemnification requirement in the policy that WAPA's failure to file such a suit would be ample justification for Aegis to deny WAPA's claim.

    Defendant's Opposition to Plaintiff's Motion To Dismiss Defendant's Counterclaim, Exhibit A, p. 2. This court, however, should not expend its judicial resources merely at the request of plaintiff's insurance company.